## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RASUL MOORE, | : | |
| *Petitioner* | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| JOHN RIVELLO, *et al.*,[1] | : | **No. 20-838** |
| *Respondents* | : | |

## MEMORANDUM

PRATTER, J.                                                        MAY ⅗‾ , 2022

Rasul Moore petitions this Court for a writ of habeas corpus. In analyzing his petition, the

Court must decide whether, in light of the recent Third Circuit Court of Appeals decision in *Baxter*

*v. Superintendent Coal Township SCI*, 998 F.3d 542 (3d Cir. 2021), Mr. Moore has demonstrated

that his counsel's failure to object to the trial court's unconstitutional reasonable doubt jury

instruction caused Mr. Moore actual prejudice at trial. Upon careful review of this case and of the

Magistrate Judge's Report and Recommendation, this Court agrees that Mr. Moore was prejudiced

by his trial counsel's failure to object to the state court's fundamentally flawed reasonable doubt

jury instruction. As a result, the Court grants Mr. Moore's petition.

### BACKGROUND

### I.    Factual Background

Around 1:06 p.m. on October 21, 2002, Philadelphia Police Officer Christopher Daukus

and his partner, Officer DiBiasio, responded to a radio call that there had a shooting on Camac

---

[1] Mr. Moore is incarcerated at the State Correctional Institution at Huntingdon, Pennsylvania ("SCI-Huntingdon"), and he properly named Kevin Kauffman, who was the superintendent of SCI-Huntingdon, as the respondent in this case. Since that filing, John Rivello has replaced Mr. Kauffman as the superintendent of SCI-Huntingdon. Therefore, the Court substituted Mr. Rivello as the correct respondent in this case. *See* Rules Governing Section 2254 Cases in the United States District Courts R. 2(a) ("If the petitioner is currently in custody under a state-court judgment, the petition must name as respondent the state officer who has custody.").

Street in northern Philadelphia. Mar. 22, 2005 Trial Tr., at 81:21–82:10, 89:3–4. The officers were the first on the scene and located a body in front of 3615 Camac Street, near its intersection with West Venango Street. *Id*. at 82:7–8, 83:15–17. The victim was laying facedown; Officer Daukus flipped the victim over and discovered gunshot wounds to the victim's chest. *Id*. at 84:13–21. Officer Daukus checked for a pulse, which he could not find, and then helped the rescue squad load the victim onto a stretcher. *Id*. at 84:21–85:2. The victim, later identified as James "Bey" Moore,[2] died from multiple gunshot wounds, which had severed his pulmonary artery and aorta. Mar. 23, 2015 Trial Tr., at 25:18–22, 26:1–9.

Officer Daukus did not observe any other people at the scene when he arrived, and he did not speak to anyone at the time. Mar. 22, 2005 Trial Tr., at 89:6–16. Approximately 40 minutes later, after having accompanied James Moore to the hospital, Officer Daukus returned to the scene of the shooting to interview a potential witness. *Id*. at 79:25–81:13, 88:21–24, 90:9–17. This witness had sought out SEPTA police officers to report what had happened, and the SEPTA police then contacted the Philadelphia Police. *Id*. at 80:6–9. Officer Daukus spoke with this witness, Andre Stewart, and prepared an incident report based on that conversation. *Id*. at 91:6–92:5; Commw. Ex. 3. The police later took a formal statement from Mr. Stewart during which he identified petitioner Rasul Moore as the shooter. Commw. Ex. 6.

Fourteen months after the shooting, on December 16 and December 18, 2003, Philadelphia police detectives interviewed and took statements from two other people, Wayne Atkins and Ada Patterson, both of whom also identified Rasul Moore in a photo lineup. Commw. Exs. 1, 2. A warrant was not issued for Rasul Moore until January 13, 2004. Mar. 28, 2005 Trial Tr., at 16:18–19. The police arrested him on January 29, 2004. Dkt. No. CP-51-CR-0508041-2004, at 1.

---

[2] Because the victim and the defendant share the same last name, the Court will refer to both using their full names where necessary to avoid confusion.

He was charged with first degree murder in violation of 18 Pa. Cons. Stat. § 2502(a), third degree murder in violation of 18 Pa. Cons. Stat. § 2502(c), and possession of an instrument of a crime in violation of 18 Pa. Cons. Stat. § 907. Dkt. No. CP-51-CR-0508041-2004, at 3.

At trial, the Commonwealth presented no physical evidence tying Rasul Moore to the shooting. Instead, the Commonwealth relied solely on the testimony of the three self-described eyewitnesses, Mr. Stewart, Mr. Atkins, and Ms. Patterson. On the witness stand, Mr. Atkins and Ms. Patterson both functionally recanted their earlier statements to the police, stating variously that they did not remember what happened, that they were taking drugs and drinking alcohol at the time of the shooting, and that the police coerced them into giving the statements in which they identified Rasul Moore.

With two "eyewitnesses" having faltered, the Commonwealth's case rested on Mr. Stewart. But Mr. Stewart was also a questionable witness given that his testimony at trial and his statement to the police immediately after the shooting had significant factual inconsistencies and unexplainable contradictions. Moreover, even despite his statement and identification of Rasul Moore's photo on the day of the shooting, the Philadelphia Police did not make an arrest until fifteen months later, and only did so *after* searching for and obtaining statements from Mr. Atkins and Ms. Patterson. This further suggests that the police may not have believed Mr. Stewart to be a credible witness.

The trial lasted under two days; the jury deliberated for three days. On its second day of deliberating, the jury announced that it was deadlocked; the trial court instructed them to continue deliberating. The jury then came back to the trial court multiple times with numerous questions about the evidence.

Finally, on its third day of deliberation, the jury reached a verdict, finding Rasul Moore not guilty of first-degree murder, guilty of third-degree murder, and guilty of possession of an instrument of a crime. Judge Hughes sentenced Mr. Moore to between 20 and 40 years in prison on the third-degree murder conviction and a consecutive term of between 2.5 to 5 years on the possession of an instrument of a crime conviction. May 13, 2005 Trial Tr., at 13:21–14:1; Dkt. No. CP-51-CR-0508041-2004, at 4.

## II.   Procedural Background

Mr. Moore's process of appealing his case through the state courts over a period of 15 years is a demonstration of how cumbersome and laden this system can become for criminal defendants.

### A.   Mr. Moore's Direct Appeal

Mr. Moore directly appealed his convictions on three grounds: (1) the evidence was insufficient to support the verdict, (2) the trial court erred in denying Mr. Moore the opportunity to impeach Mr. Stewart's credibility, and (3) the trial court erred in denying his request for a mistrial based on the prosecutor's closing argument. The trial judge, Judge Hughes, issued an opinion recommending affirmance on appeal.[3] *Commonwealth v. Moore*, No. 0405-0804, 2005 WL 6067862 (Phila. Ct. C.P. Dec. 6, 2005). The Pennsylvania Superior Court affirmed the judgment, finding the sufficiency of the evidence claim waived and rejecting the other claims on the merits.[4] *Commonwealth v. Moore*, No. 1807 EDA 2005 (Pa. Super. Ct. Oct. 27, 2006); *Commonwealth v. Moore*, 913 A.2d 944 (Pa. Super. Ct. 2006) (Table).

---

[3] This is required under Pennsylvania law. 210 Pa. Code § 1925(a).

[4] The Superior Court refused to consider this claim on the merits and deemed it waived because Mr. Moore's Statement of Matters Complained of on Appeal did not "mention which conviction he was appealing[ ] or discuss the specific reasons for the appeal." Opinion, at 7, *Commonwealth v. Moore*, No. 1807 EDA 2005 (Pa. Super. Ct. Oct. 27, 2006). This is confusing for two reasons. First, Mr. Moore's statement explicitly stated he was challenging both convictions on appeal. Second, a 1925(b) statement must only "concisely identify each error. . . with sufficient detail to identify the issue. . . for the judge." 210 Pa. Code § 1925(b)(4)(ii). In considering such a statement, "[t]he judge shall not require the citation to authorities or to the record" and "shall not require any party to file a brief, memorandum of law, or response as part of or in conjunction with the Statement." *Id.* § 1925(b)(4)(ii), (iii). An appellant is also

4

### B.  Mr. Moore's First PCRA Petition

Mr. Moore filed a *pro se* petition October 18, 2007, pursuant to Pennsylvania's Post Conviction Relief Act, 42 Pa. Cons. Stat. § 9541 *et seq*. The court granted Mr. Moore's petition in part by reinstating his right to file a petition for allowance of appeal as part of his direct appeal process. Mr. Moore then petitioned for an allowance of appeal to the Pennsylvania Supreme Court, which the Pennsylvania Supreme Court denied.

### C.  Mr. Moore's Second PCRA Petition

On June 23, 2010, Mr. Moore filed another PCRA petition. The case was then reassigned to the Honorable Shelly Robins New after Judge Hughes resigned.[5] Mr. Moore's appointed counsel subsequently filed two amended petitions. In those amended petitions, Mr. Moore submitted several ineffective-assistance- of-counsel claims, though not the same ineffective-assistance-of-counsel claim as in his current federal habeas petition. *See Commonwealth v. Moore*, No. 3211 EDA 2017, 2019 WL 6825166, at *1 (Pa. Sup. Ct. Dec. 13, 2019). In the meantime, Mr. Moore's appointed PCRA counsel, James Bruno, was suspended from the practice of law, and Mr. Moore was assigned another new counsel, David Rudenstein. The Court of Common Pleas dismissed Mr. Moore's petition. Mr. Moore did not timely appeal. *Moore*, 2019 WL 6825166, at *1.

Mr. Moore then filed another PCRA petition, this time arguing that he had directed his second PCRA counsel, David Rudenstein, to appeal but that Mr. Rudenstein failed to do so.

---

directed not to "provide lengthy explanations." *Id.* § 1925(b)(4)(iv). It seems an appellant navigating this statute must then approach it like Goldilocks. In order to have an appeal considered on the merits, an appellant's statement must be "just right."

[5] Before her resignation, the Pennsylvania Supreme Court required Judge Hughes to recuse herself in a different PCRA case. *Commonwealth v. Dougherty*, 18 A.3d 1095 (Pa. 2011). During that other criminal trial, Judge Hughes had ordered the court reporter to delete from the official record that she had called the defendant "vile" and then told defense counsel she was "grossly offended" that he had asked her to recuse herself based on that comment. *Dougherty*, 18 A.3d at 1096–97 (Baer, J., concurring). Four justices found that these comments called into question her impartiality in the proceedings and expressed concerns that this conduct was not an isolated incident. *Id.* at 1096–98 & n.2.

Accordingly, Mr. Moore sought reinstatement of his rights to appeal his PCRA petition. *Moore*,
2019 WL 6825166, at *1. Mr. Moore subsequently filed a supplement to his PCRA petition,
arguing that his sentence was unconstitutional. *Moore*, 2019 WL 6825166, at *1. The Court of
Common Pleas then appointed Mr. Moore yet another new counsel, Daniel Silverman, who filed
a motion for leave to supplement Mr. Moore's PCRA petition with a claim challenging the
reasonable doubt jury instruction and arguing that Mr. Moore's trial counsel's performance was
ineffective for failing to object to the jury instruction on reasonable doubt. *Moore*, 2019 WL
6825166, at *1.

The Court of Common Pleas reinstated Mr. Moore's right to file an appeal from the denial
of PCRA relief *nunc pro tunc* and dismissed his claim that his sentence was unconstitutional. The
Court of Common Pleas did not address Mr. Moore's motion for leave to file a supplemental
petition in which he argued that his trial counsel rendered ineffective assistance by failing to object
to the reasonable doubt jury instruction. Instead, the Court of Common Pleas directed that Mr.
Moore's notice of appeal to the Pennsylvania Superior Court must be filed within 30 days. Mr.
Moore filed a Rule 1925(b) concise statement of matters complained of on appeal in October 2017.

In his Statement of Matters Complained of on Appeal, Mr. Moore presented 26 layered
ineffective-assistance-of-counsel claims. Pertinent to his claim in this federal habeas petition, Mr.
Moore argued that:

1. PCRA counsel was ineffective for failing to challenge trial counsel's effectiveness
   for failing to object to the trial court's instruction on reasonable doubt; and

2. Direct appellate counsel was ineffective for failing to challenge the trial court's
   reasonable doubt instruction and PCRA counsel was ineffective for failing to
   challenge direct appeal counsel's effectiveness on this ground.

Nearly two years later, when the Court of Common Pleas still had not filed its 1925(a) opinion,[6] upon Mr. Moore's motion to compel, the Pennsylvania Superior Court ordered the Court of Common Pleas to transmit the state court record and its § 1925(a) opinion within 30 days. *Moore*, 2019 WL 6825166, at *2 n.3. The Court of Common Pleas then did so, recommending that Mr. Moore's PCRA claim be denied on appeal. According to the Court of Common Pleas, only three of his 26 ineffective-assistance-of-counsel claims were properly before the court, including his claims regarding the trial court's reasonable doubt jury instruction. Opinion at 3–4, *Commonwealth v. Moore*, No. CP-51-CR-0508041-2004 (Phila. Ct. C.P. April 18, 2019). The Court of Common Pleas rejected all three claims as lacking merit. *Id.*

Mr. Moore appealed, presenting five claims, including a challenge to the court's reasonable doubt instruction and an allegation that all prior counsel were ineffective for failing to preserve that claim. On December 13, 2019, the Pennsylvania Superior Court rejected the ineffective-assistance-of-counsel claim regarding the reasonable doubt instruction on the merits and found the remaining claims waived. *Moore*, 2019 WL 6825166, at *1. Mr. Moore did not further appeal this decision.

### D.  Mr. Moore's Federal Habeas Petition

Mr. Moore timely filed the present federal habeas petition on February 13, 2020. His sole claim at this stage is his Sixth Amendment ineffective-assistance-of-counsel claim that his trial counsel was ineffective by failing to object to the trial court's reasonable doubt jury instruction. The Commonwealth initially opposed Mr. Moore's petition. Mr. Moore filed a reply.

---

[6] Such opinions are issued when a PCRA court summarily dismisses a PCRA petition and must support its summary dismissal after the petitioner files an appeal. 210 Pa. Code §1925(a)(1).

This Court referred Mr. Moore's petition to a randomly assigned magistrate judge for a report and recommendation. The magistrate judge recommended that the Court deny Mr. Moore's petition.

Mr. Moore timely objected to the R&R. After this Court ordered the Commonwealth to respond to the objections, the Commonwealth eventually responded, changing positions from its initial opposition to Mr. Moore's petition. The Commonwealth now agrees that this Court should issue the writ and grant Mr. Moore a new trial.

LEGAL STANDARD

A federal district court "shall not" grant a petition for habeas corpus "unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The Supreme Court has made clear that the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) have independent meaning. *Williams v. Taylor*, 529 U.S. 362, 404–08 (2000). "A state court decision is 'contrary to' clearly established federal law if it 'applies a rule that contradicts the governing law set forth' in Supreme Court precedent, or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that reached by the Supreme Court.' " *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013) (alteration in original) (quoting *Williams*, 529 U.S. at 405–06). On the other hand, "a state court decision reflects an 'unreasonable application of such law' only 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents,' a standard the Supreme Court

8

has advised is 'difficult to meet.'" *Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 476 (3d Cir. 2017) (alteration in original) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

If a party timely objects to a magistrate judge's report and recommendation, the court *must* "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Regardless of whether timely objections are made, district courts "*may* accept, reject, or modify"— "in whole or in part"—the magistrate judge's findings or recommendations. *Id.* (emphasis added). Hence, the Court is obliged to review independently the issues at hand, even if, as is the case here, the parties are in agreement as to the result.

## DISCUSSION

Mr. Moore's sole claim in his federal habeas petition is his Sixth Amendment ineffective-assistance-of-counsel claim. He argues his trial counsel's performance was deficient for failing to object to the trial court's reasonable doubt instruction.

### I.   Mr. Moore's Habeas Petition Is Both Timely and Properly Exhausted

Mr. Moore's federal habeas petition is timely. The Pennsylvania Supreme Court denied his petition for allowance of direct appeal on August 21, 2019. Dkt. No. 100 EAL 2009, at 3. From that date, Mr. Moore had 90 days to file for a petition for a writ of certiorari in the United States Supreme Court. U.S. Sup. Ct. R. 13. Because he did not do so, his conviction became "final" for federal habeas purposes on November 19, 2009. *Greene v. Fisher*, 565 U.S. 34, 39 (2011).

From that date, Mr. Moore had one year to file any PCRA petition. 42 Pa. Cons. Stat. §§ 9545(b)(1), (b)(3). On June 23, 2010, Mr. Moore filed a PCRA petition. This filing also began tolling the one-year limitation period for filing a federal habeas petition. 28 U.S.C. § 2244(d)(2). The Pennsylvania Superior Court denied his PCRA petition on December 13, 2019, *Moore*, 2019 WL 6825166, at *1, so Mr. Moore had 30 days, that is until January 12, 2020, to seek discretionary

9

review in the Pennsylvania Supreme Court. 210 Pa. Code §§ 903(a), 1113(a). On that day, when he did not seek discretionary review, the tolling of the one-year period to file a federal habeas petition ended. 28 U.S.C. § 2244(d)(2); *Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 85 n.4 (3d Cir. 2013). At that point, Mr. Moore had 149 days remaining to file a federal habeas petition. He filed this federal habeas petition on February 13, 2020, 32 days later. Doc. No. 1.

Mr. Moore's ineffective-assistance-of-counsel claim has also been properly exhausted, as required under AEDPA. 28 U.S.C. § 2254(b)(1)(A). Mr. Moore has presented his ineffective-assistance-of-counsel claim in "one complete round of the state's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). The Court of Common Pleas considered and rejected this claim. Opinion, at 6–9, *Moore*, No. CP-51-CR0508041-2004 (Phila. Ct. C.P. Apr. 18, 2019). The Pennsylvania Superior Court also considered and rejected it. *Moore*, 2019 WL 6825166, at *1. Mr. Moore did not seek discretionary review from the Pennsylvania Supreme Court, but he was not required to do so in order to properly exhaust his state court remedies for purposes of filing a federal habeas petition. *Lambert v. Blackwell*, 387 F.3d 210, 233 (3d Cir. 2004).[7]

Because the Pennsylvania Superior Court was the last state-court adjudication of this claim on the merits, that is the decision this Court reviews. *Greene*, 565 U.S. at 40.

## II.   The Trial Court's Reasonable Doubt Instruction was Unconstitutional

In charging the jury with the task to assess Mr. Moore's guilt, the trial judge delivered a reasonable doubt instruction that began by closely following the Pennsylvania Standard Jury Instruction: "What I want you to focus on is . . . reasonable doubt, what it means when a reasonably

---

[7] Review by the Pennsylvania Supreme Court is discretionary, meaning that "petitioners need not seek review from the Pennsylvania Supreme Court in order to give the Pennsylvania courts a 'full opportunity to resolve any constitutional claims.'" *Lambert*, 387 F.3d at 233–34 (internal quotation marks omitted).

careful and sensible person pauses or hesitates or refrains from acting." Mar. 23, 2005 Trial Tr., at

137:16–21; *see* Pa. Suggested Standard Jury Instructions (Crim.) §7.01 (2016). The trial court then

presented an extended illustration of reasonable doubt *not* found in the standard jury instructions:

> Take, for example, if someone you loved dearly—your child, your spouse, your significant other—someone truly precious to you was told by their physician that they had a life-threatening condition, condition was terminal, and that the only protocol that existed for treatment of that condition was an experimental surgery.
> Now, if you're like me, you very likely are going to seek a second opinion. You're probably going to get a third opinion. You're probably going to go on the Internet and research what is this condition your loved one has.
> You might call up, asking them "What have you heard? Does this work?"
> Obviously, what you're looking for is a guarantee that the surgery will cure your loved one; but at some point the question will be called. There is no guarantee. It's an experimental procedure. If you choose to go forward with this procedure for your loved one, it may not necessarily be because you have eliminated all doubt. It will be because you have eliminated all reasonable doubt. If you have reasonable doubt, you won't have the procedure; but if all reasonable doubt is gone, you will go forward.

Mar. 23, 2005 Trial Tr., at 137:21–138:21. The trial judge finished with the remainder of the

standard instruction, explaining: "A reasonable doubt must be a real doubt. It may not be one that

is imagined or manufactured in order to avoid carrying out an unpleasant responsibility." *Id.* at

138:22–25; *see* Pa. Suggested Standard Jury Instructions (Crim.) §7.01 (2016).

The Court of Common Pleas and the Pennsylvania Superior Court both determined that

this reasonable doubt instruction was constitutional, meaning that Mr. Moore's ineffective-

assistance-of-counsel claim lacked merit.[8] Opinion, at 6–7, *Moore*, No. CP-51-CR0508041-2004,

(Phila. Ct. C.P. April 18, 2019); *Moore*, 2019 WL 6825166, at *5–6.

---

[8] Pennsylvania courts have "refined" the *Strickland* analysis into a three-part inquiry. *Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014). "[T]o prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result." *Id.* While the Pennsylvania courts analyze the merit of the underlying claim as part of an ineffective-assistance-of-counsel claim, for analytical clarity, this Court will separately analyze the constitutionality of the reasonable doubt instruction.

The Commonwealth agrees with Mr. Moore that the instruction is unconstitutional. The magistrate judge did not address this portion of the state court's decision because she concluded that, even assuming the instruction was unconstitutional, Mr. Moore had demonstrated no prejudice from his counsel's failure to object. Nonetheless, the magistrate judge noted the multiple decisions in this District concerning the constitutionality of this same jury instruction.

Because of the weighty constitutional issues involved, because there is not yet an opinion from the Third Circuit Court of Appeals on this reasonable doubt instruction, and because the magistrate judge did not address this question in her R&R, this Court first analyzes the jury instruction at issue here before analyzing the state court's decision.

A. <u>The Reasonable Doubt Jury Instruction Was Unconstitutional</u>

A missing or improper jury instruction may deprive a defendant of his due process rights under the Fourteenth Amendment. *Sandstrom v. Montana*, 442 U.S. 510, 523–24 (1979); *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 284–85 (3d Cir. 2018). In every criminal trial, the court must instruct the jury that the defendant may be found guilty only if the prosecution has proved his guilt beyond a reasonable doubt. This reasonable doubt instruction is so important that a court's failure to give any reasonable doubt instruction "is a structural error that so infects the trial process that the verdict cannot be said to reflect a proper verdict in a criminal case." *Baxter v. Superintendent Coal Township SCI*, 998 F.3d 542, 548 (3d Cir. 2021) (citing *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993)). Without any reasonable doubt instruction, "the resulting trial is always a fundamentally unfair one." *Id.* (quoting *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017)).

Where a trial court does give a reasonable doubt jury instruction, however, "the rules concerning evaluating a jury instruction apply," such that the court must assess the instruction for accuracy. *Id.* Jury instructions must state the law accurately and clearly. In assessing a particular

instruction's accuracy, the reviewing court must "ascertain how a reasonable jury would have interpreted the instructions at issue." *Tyson v. Superintendent Houtzdale SCI*, 976 F.3d 382, 392 (3d Cir. 2020) (quoting *Smith v. Horn*, 120 F.3d 400, 413 (3d Cir. 1997)). Though most courts, including those in Pennsylvania, tend to follow standard proposed jury instructions, "no particular set of words is mandated." *United States v. Isaac*, 134 F.3d 199, 202 (3d Cir. 1998). The language used in the instruction must be examined "in its totality" so as to determine "whether the instructions correctly captured the applicable legal concepts." *Baxter*, 998 F.3d at 548. No "particular sentence or paragraph" should be assessed "in isolation." *United States v. Thayer*, 201 F.3d 214, 221 (3d Cir. 1999), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010).

But just because an instruction states *part* of the correct legal standard does not mean that the instruction as a *whole* is accurate. If an instruction contains a "defect," "other language in the instruction" that "correctly explains the law" might not "serve to cure the error," especially where the correct language "merely contradicts and does not explain the defective language." *Bey v. Superintendent Green SCI*, 856 F.3d 230, 241 (3d Cir. 2017) (quoting *Whitney v. Horn*, 280 F.3d 240, 256 (3d Cir. 2002)). That is because, given our cultural and legal adherence to the sanctity of the jury deliberations, "a reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Bennett*, 886 F.3d at 285 (quoting *Francis v. Franklin*, 471 U.S. 307, 322 (1985)).

For reasonable doubt instructions that are alleged to be defective, the reviewing court must determine if there is "'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72

(1991)). Proof beyond a reasonable doubt does not mean proof beyond *all* doubt, *see Dunbar v. United States*, 156 U.S. 185, 199 (1895), nor proof to a "mathematical certainty," *Holland v. United States*, 348 U.S. 121, 138 (1954). Nor does it mean "grave uncertainty" or "actual substantial doubt." *Cage v. Louisiana*, 498 U.S. 39, 41 (1990), *overruled on other grounds by Estelle*, 502 U.S. at 72 n.4. Instead, reasonable doubt is a *fair* doubt based "upon reason," common sense, or experience "rather than whim, possibilities or supposition." *United States v. Hernandez*, 176 F.3d 719, 728 (3d Cir. 1999). It requires the jury "to reach a subjective state of near certitude of the guilt of the accused." *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). To be constitutional, a reasonable doubt instruction must make this clear. If the reasonable doubt instruction is found to be unconstitutional, it, too, is a structural error requiring automatic reversal if raised on direct appeal. *Sullivan*, 508 U.S. at 281–82.

Take, for example, *Cage v. Louisiana*. There, the United States Supreme Court found a reasonable doubt instruction unconstitutional where it equated "reasonable doubt" to "*grave* uncertainty" or "*substantial* doubt" about the evidence and referenced "moral certainty" rather than "evidentiary certainty." *Cage*, 498 U.S. at 41 (emphasis added); *accord Sullivan*, 508 U.S. at 278 (finding a nearly identical instruction unconstitutional). That is because "the words 'substantial' and 'grave,' as they are commonly understood, suggest[ed] a higher degree of doubt than" mere reasonable doubt. *Id.* As such, the Supreme Court determined that jurors may have understood the law to permit finding the defendant guilty under a lower "degree of proof." *Id.*

Reasonable doubt instructions are preferably phrased in terms of the doubt that causes a person to *hesitate to act*, rather than the type of doubt that causes a person *to act*. *Holland*, 348 U.S. at 140. In other words, if a jury does not have reasonable doubt, it should act by finding the defendant guilty, but where a jury *does* have reasonable doubt, it should *not act* and, thus, not find

the defendant guilty. Reversing this intuitive arrangement and giving "[a] definition of doubt as something the jury would act upon" risks "creat[ing] confusion rather than misapprehension." *Id.*

At Mr. Moore's trial, the trial court offered the following reasonable doubt instruction:

> [R]easonable doubt, what it means when a reasonably careful and sensible person pauses or hesitates or refrains from acting.
>
> Take, for example, if someone you loved dearly—your child, your spouse, your significant other—someone truly precious to you was told by their physician that they had a life-threatening condition, condition was terminal, and that the only protocol that existed for treatment of that condition was an experimental surgery.
>
> Now, if you're like me, you very likely are going to seek a second opinion. You're probably going to get a third opinion. You're probably going to go on the Internet and research what is this condition your loved one has.
>
> You might call up, asking them "What have you heard? Does this work?"
>
> Obviously, what you're looking for is a guarantee that the surgery will cure your loved one; but at some point the question will be called. There is no guarantee. It's an experimental procedure. If you choose to go forward with this procedure for your loved one, it may not necessarily be because you have eliminated all doubt. It will be because you have eliminated all reasonable doubt. If you have reasonable doubt, you won't have the procedure; but if all reasonable doubt is gone, you will go forward.
>
> A reasonable doubt must be a real doubt. It may not be one that is imagined or manufactured in order to avoid carrying out an unpleasant responsibility.

Mar. 23, 2005 Trial Tr., at 137:18–138:25.

The Court of Appeals for the Third Circuit has not yet directly addressed this specific reasonable doubt instruction. *See Baxter*, 998 F.3d at 546–47 & n.5 (assuming without deciding that the instruction was unconstitutional). Nonetheless, numerous other district courts in this District have considered the precise reasonable doubt instruction at issue in this petition and have

come to conflicting conclusions. Seven courts have found the instruction unconstitutional.[9] Six have found the instruction, or at least a version of it, to satisfy due process.[10]

*Brooks*, the first case to examine this instruction in detail, found that the instruction permitted the jury to convict the defendant on a degree of proof below the reasonable doubt standard. *Brooks v. Gilmore*, No. 15-cv-5659, 2017 WL 3475475, at *3 (E.D. Pa. Aug. 11, 2017) (citing *Cage*, 498 U.S. at 41). As the *Brooks* court explained, equating "reasonable doubt" with the level of doubt required to move forward with an experimental medical procedure is problematic because a person "would need profound, if not overwhelming, doubt to deny a loved one their only or best opportunity for a cure." *Id.* at *4. Furthermore, as the *Brooks* court noted, the jury instruction twice used the phrase "if you go forward," which contravened the Supreme Court's preference that a reasonable doubt instruction should be phrased as doubt that might cause a juror to hesitate "rather than the kind on which he would be willing to act." *Id.* (quoting *Holland*, 348 U.S. at 140). Taken together, the court explained, "the [trial] court's hypothetical was structured in a way that would encourage the jury to **resolve** any doubt." *Id.*

---

[9] *Corbin v. Tice*, No. 16-cv-4527, 2021 WL 2550653, at *2–5 (E.D. Pa. June 22, 2021); *Jackson v. Capozza*, No. 17-cv-5126, 2019 WL 12288169, at *8–10 (E.D. Pa. Feb. 28, 2019), *report and recommendation adopted*, 2021 WL 1962887 (May 17, 2021); *Shields v. Smith*, No. 18-cv-750, 2020 WL 6929097, at *13–14 (E.D. Pa. Oct. 5, 2020), *report and recommendation adopted*, 2020 WL 6888466 (Nov. 24, 2020); *Edmunds v. Tice*, No. 19-cv-1656, 2020 WL 6810409, at *8–9 (E.D. Pa. Aug. 31, 2020), *report and recommendation adopted*, 2020 WL 6799259 (Nov. 19, 2020); *McDowell v. DelBalso*, No. 18-cv-1466, 2019 WL 7484699, at *3–4 (E.D. Pa. Jan. 23, 2019), *report and recommendation adopted*, 2020 WL 61162 (Jan. 3, 2020); *Brown v. Kauffman*, 425 F. Supp. 3d 395, 408–10 (E.D. Pa. 2019); *Brooks v. Gilmore*, No. 15-cv-5659, 2017 WL 3475475, at *3–5 (E.D. Pa. Aug. 11, 2017).

[10] *Green v. Smith*, No. 18-cv-4734, 2020 WL 10058148, at *10–11 (E.D. Pa. Nov. 4, 2020), *report and recommendation adopted*, 2021 WL 2454482 (June 16, 2021); *Bey v. Kauffman*, No. 19-cv-2127, 2020 WL 5775932, at *17 (E.D. Pa. July 15, 2020), *report and recommendation adopted*, 2020 WL 5763550 (Sept. 28, 2020); *Gant v. Giroux*, No. 15-cv-4468, 2017 WL 2825927, at *14–15 (E.D. Pa. Feb. 27, 2017), *report and recommendation adopted*, 2017 WL 2797911 (June 28, 2017), *vacated and remanded in light of Commonwealth's concession*, Order, No. 17-cv-2559 (3d Cir. Sept. 4, 2018); *Baxter v. McGinley*, No. 18-cv-46, 2019 WL 7606222, at *5–6 (E.D. Pa. Dec. 5, 2019), *report and recommendation adopted*, 2020 WL 299517 (Jan. 17, 2020), *aff'd on other grounds*, 998 F.3d 542, 544 (3d Cir. 2021); *Johnson v. Varner*, No. 01-cv-2409, slip op. at 7–8, Doc. No. 24 (E.D. Pa. Sept. 4, 2003); *see also Walker v. Brittain*, No. 18-cv-3705, 2020 WL 4815874, at *18 (E.D. Pa. Aug. 19, 2020) (finding *Martinez* exception to procedural default did not apply because PCRA counsel did render ineffective assistance in failing to raise ineffective-assistance-of-trial-counsel claim based on same reasonable doubt instruction where no court at the time of trial had found the instruction to be unconstitutional).

Numerous other courts within this district have agreed with the reasoning in *Brooks*. *See Corbin v. Tice*, No. 16-cv-4527, 2021 WL 2550653, at *3–4 (E.D. Pa. June 22, 2021) (collecting cases and their reasoning).This Court joins them and finds that this reasonable doubt instruction is unconstitutional and violated Mr. Moore's due process rights under the Fourteenth Amendment. Without rehashing the other courts' reasoning, this Court adds its own gloss.

First, the emotionally charged nature of the trial court's reasonable doubt illustration is particularly problematic. To be sure, hypotheticals, analogies, and similes are rhetorical devices that help people to understand vague and abstract concepts such as reasonable doubt. But an incorrect hypothetical or an "emotionally charged analogy" that is "positioned towards the end of [an] instruction" before it "snap[s] back into cold, distant, and clinical legalese" leaves a lasting impression on a jury. *Corbin*, 2021 WL 2550653, at *7. Indeed, "'[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury.'" *Holland*, 348 U.S. at 140 (quoting *Miles v. United States*, 103 U.S. 304, 312 (1880)). Thus, using such rhetorical devices in jury instructions creates the risk that jurors will latch on to the hypothetical or analogy rather than grappling with the vague and abstract concept itself, as they must.

Second, the reasonable doubt instruction in this case is conflicting in two ways, both of which are problematic. The trial court's instruction began with the standard definition of reasonable doubt, then, through the extended analogy, suggested that the jury could still convict the defendant even if they had grievous or substantial doubt, *Brooks*, 2017 WL 3475475, at *4, and then transitioned back to the standard definition of reasonable doubt. Moreover, in the first part of the instruction, the trial court correctly explained reasonable doubt as something that would lead a juror to pause or hesitate from acting. Mar. 23, 2005 Trial Tr., at 137:18–21. Shifting into the hypothetical, the trial court situated reasonable doubt in terms of acting, as something a person

considering an experimental medical procedure for a loved one would overcome "if you choose to go forward" with the procedure. *Id.* at 138:15–21. After the hypothetical, the trial court once again described reasonable doubt as something that might make someone refrain from acting. *Id.* at 138:22–25. Both of these conflicts within the instruction itself make it nearly impossible for a reviewing court to determine which of the two versions of reasonable doubt the jurors applied. *Francis*, 471 U.S. at 322. In such a case, there is a real possibility that a jury applied the incorrect version. *See id.* at 325; *Jackson v. Capozza*, No. 17-cv-5126, 2019 WL 12288169, at *8–10 (E.D. Pa. Feb. 28, 2019), *report and recommendation adopted*, 2021 WL 1962887 (May 17, 2021).

Third, the Commonwealth has continued to distance itself from this particular jury instruction. At first, the Commonwealth shifted its position and declined to defend the instruction. *See, e.g.*, *McDowell v. DelBalso*, No. 18-cv-1466, 2019 WL 7484699, at *4 (E.D. Pa. Jan. 23, 2019), *report and recommendation adopted*, 2020 WL 61162 (E.D. Pa. Jan. 3, 2020) ("The conclusion that the instruction violates due process is further bolstered by the Commonwealth's strategic decision not to defend it."). As this issue has continued to percolate in this District, the Commonwealth has since outright conceded that the instruction is unconstitutional. Letter at 2, *Gant v. Giroux*, No. 15-cv-04468 (E.D. Pa. Oct. 4, 2018), Doc. No. 37; Brief for Appellees at 7 n.2, *Baxter v. Superintendent Coal Twp. SCI*, 998 F.3d 542 (3d Cir. 2021) (No. 20-1259), Doc. No. 22.

The Commonwealth has also conceded the instruction is unconstitutional in this case. That is especially persuasive because "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). Thus, the Court's role is not to intervene and supply an argument that the instruction *is* constitutional when neither party defends it. Plus, the Commonwealth aptly points out that a

prosecutor's "interest 'in a criminal prosecution is not that he shall win a case, but that justice shall be done.'" *Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 290 (3d Cir. 2016) (en banc). The Court agrees and commends the Commonwealth for its commitment to justice. That the Commonwealth concedes the instruction is unconstitutional lends further support to the Court's conclusion that the instruction is, in fact, unconstitutional.

Finally, it is important to separate the instruction's constitutionality from the strength of the underlying evidence. *Cf. Corbin*, 2021 WL 2550653, at *3 (considering prejudice in deciding if instruction is constitutional). Although the inquiries are related, they are not identical. Due process guarantees an accurate reasonable doubt instruction, even if the evidence against the defendant is overwhelming. A habeas court reviewing a trial court's jury instructions does eventually consider the evidence adduced at trial, *see, e.g., Isaac*, 134 F.3d at 205, but it does so *after* it has found the instructions unconstitutional in order to decide the remedy, not before. A faulty reasonable doubt instruction is considered a structural error requiring automatic reversal if raised on direct appeal. *Sullivan*, 508 U.S. at 281–82. But, on collateral appeal in the context of an ineffective-assistance-of-counsel claim, trial counsel's failure to object to that very same erroneous instruction does not trigger a presumption of prejudice. *Baxter*, 998 F.3d at 547–48 & n.6. Instead, the habeas court must still determine whether a counsel's failure to object to that structural error caused a defendant actual prejudice under the familiar *Strickland* analysis. *Id.* at 548 & n.6.

B. <u>The State Court's Decision Was Contrary to Clearly Established Federal Law</u>

That the jury instruction was unconstitutional, however, does not end the inquiry. Indeed, the Pennsylvania Superior Court assessed this instruction on its merits and decided that it *was* constitutional. The Court must now assess whether that decision was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. 8 U.S.C. § 2254(d)(1). This Court, like other courts in this District to have

considered this issue, finds that it was. *See, e.g.*, *Corbin*, 2021 WL 2550653, at *7; *Brooks*, 2017 WL 3475475, at *8–10.

To its credit, the Pennsylvania Superior Court here engaged substantively with the problematic jury instruction. *Cf. Corbin*, 2021 WL 2550653, at *7; *Brooks*, 2017 WL 3475475, at *9. And, for the most part, the Superior Court stated the correct legal standards. It stated the correct legal standards for evaluating jury instructions, noting that they must be considered as a whole to determine whether the instruction presented the correct legal standard to the jury. *Moore*, 2019 WL 6825166, at *5. And the Superior Court correctly stated that a reasonable doubt instruction is problematic if there is a reasonable likelihood that a jury could have convicted a person on less than reasonable doubt. *Id.* While it did not engage substantively with its reasoning, the Superior Court did acknowledge the *Brooks* decision, which reached the opposite conclusion about the same reasonable doubt instruction. The Superior Court declined to follow suit. *Id.* at *4. Of course, state courts are not inexorably bound by the decisions of federal courts other than the United States Supreme Court. *Id.* at *4; *see Dietz v. Chase Home Fin., LLC*, 41 A.3d 882, 886 n.3 (Pa. Super. Ct. 2012); *Surrick v. Killion*, 449 F.3d 520, 535 (3d Cir. 2006).

The Superior Court's approach was flawed, however, when it characterized Mr. Moore's trial court's hypothetical to the jury as "at best ambiguous," but, nonetheless, concluded that the hypothetical was constitutional. *Moore*, 2019 WL 6825166, at *5. Though acknowledging that the hypothetical *might* have led the jury to "underst[an]d the degree of doubt the Commonwealth must overcome to secure a conviction as being lower than the law requires," the Superior Court, nonetheless, concluded that it was "not *clear* that the illustration lowered the degree of doubt." *Id.* (emphasis added). The Superior Court should have stopped once it acknowledged that the instruction was ambiguous. That is because "[a] reviewing court has no way of knowing which of

the two irreconcilable instructions the jurors applied in reaching their verdict." *Francis*, 471 U.S. at 322. Whether or not the Superior Court "believe[d]" the jury applied the instruction in a constitutional manner is irrelevant. *Moore*, 2019 WL 6825166, at *5. There simply is no recognized category of "ambiguously constitutional" or "constitutionally ambiguous" reasonable doubt instructions. Once the Superior Court acknowledged that it was "not clear [whether] the illustration lowered the degree of doubt" required to convict Mr. Moore, *id.*, that should have been the end of the inquiry.

In other words, despite engaging with the Supreme Court's decisions in *Cage* and *Estelle*, the Superior Court determined that the reasonable doubt instruction here was ambiguous, meaning the instruction *might* have "suggest[ed] a higher degree of doubt than is required for acquittal under the reasonable-doubt standard." *Cage*, 498 U.S. at 41. The Superior Court then stated that it did not "believe" this problem had affected the jury. Fair minded jurists would not disagree that this was an unreasonable application of *Cage*, which found the reasonable doubt instruction to be unconstitutional where, like here, "a reasonable juror *could* have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Id.* (emphasis added); *see Mathias*, 876 F.3d at 476. Thus, the Superior Court's decision was an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).

## III. Mr. Moore's Ineffective-Assistance-of-Counsel Claim Is Meritorious and Requires Habeas Relief

Having determined that the reasonable doubt instruction at issue here is unconstitutional, the Court next turns to whether Mr. Moore's counsel rendered ineffective assistance by failing to object to the instruction.

To succeed on an ineffective-assistance-of-counsel claim, a petitioner must demonstrate *both* that his counsel's performance was deficient and that the deficient performance prejudiced

his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel is assumed to have rendered effective assistance and the burden to prove otherwise always remains on the petitioner. *Burt v. Titlow*, 571 U.S. 12, 22 (2013). To show that his counsel's performance was deficient, a petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Assuming a petitioner demonstrates that his counsel's performance was deficient, he must also show that he was prejudiced, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Where a state court addressed a petitioner's claim that his counsel was ineffective and the state court applied the correct legal standard, a petitioner must show that the state court decision "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). A federal court is not to substitute its own judgment for that of the state court. *Id.* In other words, a review of an ineffective-assistance-of-counsel claim in a habeas petition is "doubly deferential" because the reviewing federal court must give "the benefit of the doubt" to *both* the state court *and* the petitioner's counsel. *Burt,* 571 U.S. at 15; *accord Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014).

On PCRA review, the Pennsylvania Superior Court concluded that Mr. Moore failed to establish that his counsel's performance was ineffective because the Superior Court concluded that the underlying claim about the reasonable doubt instruction lacked merit. *Moore*, 2019 WL 6825166, at *6. The Superior Court's decision constitutes a decision on the merits for purposes of the AEDPA, thus earning federal court deference. *Johnson v. Williams*, 568 U.S. 289, 301, 304 (2013); *Corbin*, 2021 WL 2550653, at *6. This Court, then, owes the state court's decision double deference under the AEDPA. *Burt*, 571 U.S. at 15; *Branch*, 758 F.3d at 235.

A. Mr. Moore's Trial Counsel Rendered Ineffective Assistance by Failing to Object to the Reasonable Doubt Instruction

The Pennsylvania Superior Court addressed this element of the *Strickland* analysis, though without stating so explicitly. Pennsylvania courts have turned the *Strickland* analysis into a three-part test instead of the familiar federal two-part test. *Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014). Under the first prong of the Pennsylvania test, a petitioner must show that "his underlying claim is of arguable merit." *Id.* While not explicitly addressing deficiency under *Strickland*, this determination is identical to the way federal courts analyze *Strickland*'s deficiency prong. *See, e.g.*, *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) ("[C]ounsel cannot be deemed ineffective for failing to raise a meritless claim."). Because the state court addressed the deficiency element of Mr. Moore's ineffective-assistance-of-counsel claim, this Court must defer to it. *Thomas v. Varney*, 428 F.3d 491, 501 (3d Cir. 2005); *see Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

In its initial response to Mr. Moore's petition, the Commonwealth argued that Mr. Moore's counsel's performance was not ineffective. In her R&R, the magistrate judge did not address the deficiency prong of *Strickland*, concluding that even if the counsel's performance was objectively unreasonable, Mr. Moore suffered no prejudice. After Mr. Moore objected to the R&R, the Commonwealth responded and then conceded that Mr. Moore's counsel had rendered deficient performance. Here, upon *de novo* review, the Court agrees with both Mr. Moore and the Commonwealth that Mr. Moore's counsel's performance was deficient.

The reasonable doubt standard in a criminal jury trial is of the utmost and undeniable importance. This is true both broadly, to society at large, and more narrowly, to each individual defendant. Starting broad, the founders recognized the importance of a jury as a "valuable safeguard to liberty" and "the very palladium of free government." Federalist No. 83, at 484

23

(Alexander Hamilton) (Am. Bar. Assoc. ed. 2009). That is because the people making up the jury, representing their community and society, have the constitutional authority and duty to establish the "metes and bounds of judicially administered criminal punishments." *United States v. Haymond*, 139 S. Ct. 2369, 2378–79 (2019). Indeed, juries are "drawn from the body of the people. . . and by holding the jury's right to return a general verdict in all cases sacred, we secure to the people at large, their just and rightful controul in the judicial department." Letter XV by the Federal Farmer (Jan. 18, 1788), in 2 *The Complete Anti-Federalist* 320 (Herbert J. Storing ed. 1981). That does not mean, however, that juries are infallible. The founding generation recognized that the people selected for jury duty "are not always minutely skilled in the laws," but still recognized that "they have common sense in its purity" and that they "seldom or never err[ ] in making and applying laws to the condition of the people, or in determining judicial causes, *when stated to them by the parties*." *Id.* (emphasis added). In other words, jurors rely on the parties, counsel, and the court to *supply* the correct legal standards and the parties, counsel, and the court, in turn, rely on the jury to correctly *apply* those standards. When that system breaks down, as when a jury is given an improper reasonable doubt instruction, it undermines the jury's sacrosanct role in the justice system and in society more broadly. And when a jury then applies a faulty reasonable doubt standard to deprive a fellow citizen of his right to life or liberty, it risks usurping the role of the people, via a jury, to retain control over the outer bounds of punishment that our Constitution will abide.

Reasonable doubt is a central (and sometimes the sole) defense strategy available to a criminal defendant. Indeed, often an entire case rises and falls on the single issue of reasonable doubt. The United States Supreme Court has explained that the reasonable doubt standard "plays a vital role in the American scheme of criminal procedure" because it "symbolizes the significance

24

that our society attaches to the criminal sanction and thus to liberty itself." *Jackson*, 443 U.S. at 315 (internal quotation marks omitted). That is because it "operates to give concrete substance to the presumption of innocence" and thus "ensure[s] against unjust convictions[ ] and [ ] reduce[s] the risk of factual error." *Id.* (internal quotation marks omitted). Indeed, reasonable doubt is so important that if, on direct appeal, a defendant successfully demonstrates that the reasonable instruction was either omitted entirely or constitutionally flawed, it is a structural error requiring *automatic reversal*. *Sullivan*, 508 U.S. at 281–82; *Baxter*, 998 F.3d at 548.

The foregoing discussion highlights the ineffective performance rendered by counsel in this case. True, a federal court reviewing an ineffective-assistance-of-counsel claim must not merely second guess the defendant's attorney years later and with the benefit of hindsight. *Strickland*, 466 U.S. at 689. But given the importance of a reasonable doubt instruction, the lengthy, incorrect, and emotionally charged hypothetical posed to the jury by the trial court here should have been "instinctively problematic" to any reasonable defense counsel. *Brooks*, 2017 WL 3475475, at *6. That is even truer here where Mr. Moore's counsel's strategy hinged on the reasonable doubt defense. Indeed, in closing arguments, Mr. Moore's counsel highlighted the importance of the state's burden to prove Mr. Moore's guilt "beyond a reasonable doubt" and the ways in which the state's evidence in Mr. Moore's particular case should have given jurors pause. *See, e.g.*, Mar. 23, 2005 Trial Tr., at 84:17–85:9, 101:1–3. Thus, "it is difficult to fathom how any criminal defense lawyer could fail to object." *Brooks*, 2017 WL 3475475, at *6.

The severe penalty facing Mr. Moore on a first-degree murder charge further underscores the prejudice caused by his counsel's ineffective performance. The penalty for first degree murder in Pennsylvania is, at a minimum, life in prison. 18 Pa. Cons. Stat. § 1102. Thus, it is hard to "fathom a strategic reason for counsel's failure to object to an instruction that eliminates the state's

burden to prove an element of a crime that carries a mandatory sentence of life imprisonment." *Tyson*, 976 F.3d at 396. In other words, it is such a grave instruction that defense counsel's failure to object to it requires, if nothing else, an extremely convincing explanation.

In this case, however, there is no explanation for failing to object to the reasonable doubt instruction as given, let alone a particularly convincing one. In fact, it appears that Mr. Moore's counsel did not object to *any* of the jury instructions at trial. *See* Mar. 23, 2005 Trial Tr., at 79:1–81:13. Nor did Mr. Moore's counsel suggest a different reasonable doubt instruction with language more favorable to Mr. Moore. A "trial counsel's stewardship is constitutionally deficient if he or she 'neglects to suggest instructions that represent the law that would be favorable to his or her client supported by reasonably persuasive authority' unless the failure is a strategic choice." *Tyson*, 976 F.3d at 391 (quoting *Bey*, 856 F.3d at 238). By failing to engage at all with the reasonable-doubt instruction, Mr. Moore's counsel did not "advocate [Mr. Moore's] cause" and "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. As such, Mr. Moore's counsel rendered ineffective assistance. *Corbin*, 2021 WL 2550653, at *5; *Brooks*, 2017 WL 3475475, at *6–7; *see also Tyson*, 976 F.3d at 396 (concluding that trial counsel's failure to object to faulty accomplice jury instruction in first-degree murder case constituted ineffective assistance of counsel).

Still, there is at least a colorable argument that Mr. Moore's counsel could not have anticipated that subsequent courts would find this instruction to be unconstitutional. Since at least 2004, Pennsylvania state courts have held that this instruction was not unconstitutional and have maintained that position even after federal courts have frequently come to the contrary conclusion. *See, e.g.*, *Commonwealth v. Nam*, No. 3641 EDA 2018, 2019 WL 3946049, at *3 (Pa. Super. Ct. Aug. 21, 2019). Similarly, the first federal district court in this district to issue an opinion finding

the reasonable doubt instruction at issue here to be unconstitutional was not until the *Brooks* decision in 2017, well after Mr. Moore's state trial in 2005. *Brooks*, 2017 WL 3475475, at *3–5. Indeed, federal courts at the time of Mr. Moore's trial had concluded that the instruction was constitutional. *Johnson v. Varner*, No. 01-cv-2409, slip op. at 7–8 (E.D. Pa. Sept. 4, 2003), Doc. No. 24. Thus, there is at least a nonfrivolous argument that Mr. Moore's trial counsel did not provide ineffective assistance by failing to anticipate future changes to the law. *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996); *accord Walker v. Brittain*, No. 18-cv-3705, 2020 WL 4815874, at *18 (E.D. Pa. Aug. 19, 2020) (denying *Martinez* exception to procedural default because PCRA counsel's failure to raise an ineffective-assistance-of-counsel claim that defendant's trial counsel failed to object to same jury instruction was not a significant and obvious issue to raise in a PCRA appeal in light of numerous courts at the time holding the instruction constitutional).

Such reasoning, however, is a red herring. As explained in detail above, in analyzing the reasonable doubt instruction, the state court misapplied longstanding Supreme Court precedent. Properly examined, a defense counsel faced with the reasonable doubt instruction at issue here did *not* need to anticipate future changes in law; instead, she only needed to make an objection based on then-established Supreme Court precedent. In other words, Mr. Moore's counsel could have pointed to the Supreme Court's decisions in *Cage* and *Sullivan* to make this argument, but she did not. This decision was not a strategic choice, but a careless blunder. *Cf. Gaines v. Superintendent Benner Township SCI*, __F.4th__, 2022 WL 1494388, at *6 (3d Cir. 2022) (finding counsel's decision not to object to trial court's failure to give adverse inference instruction to be strategic decision meant to avoid calling jury's attention to defendant's decision not to testify). As explained above, Mr. Moore's counsel's failure to engage with this instruction either by objecting to it or

suggesting an alternative instruction constituted ineffective assistance. *Strickland*, 466 U.S. at 688; *Tyson*, 976 F.3d at 391.

This conclusion is further supported by the line of cases establishing that certain objections at trial are so critical or crucial that a counsel's failure to make such an objection renders a counsel's performance ineffective. Courts routinely find that a counsel's performance was deficient where "counsel failed to make a crucial objection or to present a strong defense because counsel was unfamiliar with clearly settled legal principles." 3 Wayne LaFave et al., Criminal Procedure § 11.10(c) (4th ed. 2021 up.). For example, a counsel's failure to object to a misstatement of Pennsylvania law "on a point that could play a critical role in the jury's decision" constituted deficient performance. *Carpenter v. Vaughn*, 296 F.3d 138, 157–58 (3d Cir. 2002); *see also Breakiron v. Horn*, 642 F.3d 126, 137–38 (3d Cir. 2011) (finding that counsel's failure to request a jury instruction that would have entitled the defendant to properly consider the defense theory and convict the defendant of a lesser charge constitutes defective performance); *Thomas*, 428 F.3d at 495–96, 501–02 (finding that counsel's failure to object to or move to suppress prosecution's central witness's in-court identification of a defendant when that same witness could not identify the defendant in multiple pre-trial lineups constituted deficient performance). In Mr. Moore's trial, the reasonable doubt standard played a critical role and, therefore, his counsel's failure to object to this flawed instruction constituted deficient performance. *Cf. Gaines*, 2022 WL 1494388, at *6 (finding counsel was not ineffective for failing to object to lack of adverse inference instruction where "there is reasonable" and documented "disagreement as to the instruction's effectiveness").

Finally, the Commonwealth has again conceded that a failure to object to this instruction constituted defective performance. The Court has an "independent responsibility—independent

from its coequal branches in the Federal Government, and independent from the separate authority of the several States—to interpret federal law." *Williams*, 529 U.S. at 379. Still, as with the Commonwealth's concession that the instruction itself was unconstitutional, this Court must respect the principle of party presentation. *Sineneng-Smith*, 140 S. Ct. at 1579. The Commonwealth's position is another reason in this case to conclude that Mr. Moore's counsel's performance was deficient.

The Superior Court's conclusion that Mr. Moore's counsel did not render deficient performance was an "unreasonable application of" *Strickland*. 28 U.S.C. § 2254(d)(1). As described above, the reasonable doubt instruction in this case *was* unconstitutional. Thus, it is hard to fathom a trial counsel not raising an objection to a facially questionable reasonable doubt instruction when an objection on Mr. Moore's behalf and a ruling in Mr. Moore's favor either at trial or on direct appeal would have required automatic reversal. While there are, undoubtedly, "countless ways to provide effective assistance in any given case," failing to object to this reasonable doubt instruction in a first-degree murder trial is inherently and fundamentally problematic. *Strickland*, 466 U.S. at 689. The Superior Court's opposite conclusion was, therefore, an unreasonable application of clearly established federal law as determined by the United States Supreme Court in *Strickland*.

B. Mr. Moore's Counsel's Failure to Object to the Reasonable Doubt Instruction Caused Prejudice

Because of recent developments in case law, this habeas petition presents a novel legal situation. Prior district courts examining this same ineffective-assistance-of-counsel claim as to this same unconstitutional reasonable doubt jury instruction in the years after the Supreme Court's decision in *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) concluded that a defendant did not have to prove prejudice from the unconstitutional instruction because, they reasoned, prejudice

was presumed where a trial counsel failed to object to a structural error. *See, e.g.*, *Corbin*, 2021 WL 2550653, at *5–6 & n.2; *Brooks*, 2017 WL 3475475, at *7 & n.8. But the Court of Appeals for the Third Circuit rejected this reasoning in *Baxter v. Superintendent Coal Township SCI*, 998 F.3d 542 (3d Cir. 2021). There, the Third Circuit concluded that, on collateral appeal, a court reviewing an ineffective-assistance-of-counsel claim that a trial counsel failed to object to a faulty reasonable doubt instruction must "examine whether the instruction resulted in actual prejudice." *Id.* at 548. Following that guidance, this Court must examine the facts introduced at Mr. Moore's trial to determine whether he suffered actual prejudice as a result of his counsel's ineffective performance. *See McBride v. Smith*, No. 17-cv-5374, 2021 WL 4191969, at *3–4 (E.D. Pa. Sept. 15, 2021).

The Pennsylvania Superior Court did not address the prejudice prong of Mr. Moore's ineffective-assistance-of-counsel claim. *Moore*, 2019 WL 6825166, at *6. Thus, this Court reviews it *de novo*. *Breakiron*, 642 F.3d at 137 (citing *Porter*, 558 U.S. at 39). The record is adequately developed for the Court to do so. *Id.* The magistrate judge concluded that Mr. Moore suffered no prejudice under the facts of his case. Mr. Moore objected, arguing that the magistrate judge's R&R did not consider the weight of the evidence in totality and did not adequately grapple with the nature of the jury's deliberations in this case. The Commonwealth responded to Mr. Moore's objections and agreed, concluding that Mr. Moore had suffered prejudice as a result of the faulty reasonable doubt instruction.

A court reviewing the prejudice factor of a *Strickland* ineffective-assistance-of-counsel claim must consider the "totality of the evidence before the judge or jury." *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010) (quoting *Strickland*, 466 U.S. at 695). That does not mean, however, that a court is to conduct its own weighing of the evidence and decide that it would have come to a

different conclusion than the jury. Instead, a court analyzes whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The probability of a different result "must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. The Supreme Court has recently clarified that this means "at least one juror would have harbored a reasonable doubt." *Buck v. Davis*, 137 S. Ct. 759, 776 (2017).

The Court again finds that the Commonwealth's concession that Mr. Moore suffered prejudice is persuasive under the party presentation rule. *Sineneng-Smith*, 140 S. Ct. at 1579. Moreover, the Court agrees with Mr. Moore and the Commonwealth that, considering the facts of this particular case and the nature of the jury's deliberations, there is at least a reasonable probability that the result of Mr. Moore's trial might have been different with a correct reasonable doubt instruction.

*1. The Evidence Introduced at Mr. Moore's Trial Was Weak*

As Mr. Moore succinctly put it, "no eyewitness saw [Mr.] Moore shoot the decedent. No physical or statement evidence implicated him. No gun was recovered. No motive was offered." Doc. No. 27, at 9. Indeed, the Commonwealth's case rested on circumstantial evidence from the testimony of witnesses, none of whom actually witnessed the shooting. *Cf. Baxter*, 998 F.3d at 544–45. Two of the witnesses, Wayne Atkins and Ada Patterson, were not interviewed by police until 14 months after the shooting. And then on the stand later, Mr. Atkins and Ms. Patterson basically recanted their statements to the police, causing the trial judge to remark at one point during a sidebar conference that the testimony was "going south." Mar. 22, 2005 Trial Tr., at 66:25–67:3. The third witness, and the sole witness to be interviewed the day of the shooting, Andre Stewart, had several material inconsistencies in his version of events.

    i.  *Mr. Stewart*

On the day of the shooting, Mr. Stewart claimed to have seen the person that he believed

shot James Moore. In an incident report prepared by the officers, he identified the person as being

a black male, 5' 9", 150 pounds, wearing a blue shirt, blue pants, gold boots, and wearing a red

and blue hat.[11] Commw. Ex. 3; Mar. 22, 2005 Trial Tr., at 93:9–11. After getting this description

from Mr. Stewart, Officer Daukus handcuffed Mr. Stewart, placed him in the police car, and drove

him around the neighborhood in an attempt to have Mr. Stewart identify the suspected shooter.

Mar. 22, 2005 Trial Tr., at 80:19–81:5. Officer Daukus handcuffed Mr. Stewart at Mr. Stewart's

request, apparently because Mr. Stewart wanted to "draw an illusion" that he had been arrested out

of fear that he was being followed. *Id.* at 80:25–81:1; 122:3–123:3. Officer Daukus then

transported Mr. Stewart to the Philadelphia homicide department downtown to get a full statement.

*Id.* at 94:23–25; 123:20–21.

Later that same day, Mr. Stewart gave a fuller statement to the police and also identified a

suspect. Commw. Exs. 6 & 7. According to his statement, Mr. Stewart was sitting with a woman

named "Straw" on the steps on Venango Street three houses in from 13th Street. Commw. Ex. 6,

at 1. While sitting there, he witnessed the victim, James Moore, tell "Straw" that he (James Moore)

had just won $220 in a dice game. *Id.* at 2. Then the man from whom James Moore had won the

money also arrived, and he and James Moore moved their conversation a little farther down

Venango Street. *Id.* At that point, a girl with a toddler arrived and Mr. Stewart spoke with her. *Id.*

---

[11] At trial, Mr. Stewart testified that he had never seen the defendant, Rasul Moore, before the day of the shooting. Mar. 22, 2005 Trial Tr., at 97:15–18, 128:22–24. But in the incident report based on Mr. Stewart's interview, the officers had written down the name "Ramsul" or "Rasul" or "something like that." Mar. 22, 2005 Trial Tr., at 93:14–21. Mr. Moore's first name is Rasul. To Mr. Moore, this identification means that Mr. Stewart *had* seen him before, and so testified untruthfully on the stand. But Mr. Moore ignores that Mr. Stewart had stated in a follow-up incident report that he learned that the alleged shooter's name was "Rasul" from his acquaintance "Straw" after the shooting. *See* Commw. Ex. 6, at 4. Thus, Mr. Moore's argument that Mr. Stewart's testimony on this issue is inconsistent seems to be contradicted. In any case, it does not alter the Court's conclusion at this stage.

Mr. Stewart saw a car drive by and then, immediately after, saw the black male with the blue hoody and blue jeans walk by with his right hand concealed within his sleeve. *Id.* at 2–3. He made eye contact with Mr. Stewart and "stared aggressively" at him. *Id.* at 3. This man then spoke to James Moore and said "something like 'come here.'" *Id.* James Moore and the man walked up to Camac Street, crossed Venango to the southwest corner of Venango Street and Camac Street and turned the corner. *Id.* Mr. Stewart also began walking in that direction before he heard three gunshots. *Id.* The man then returned around the corner, removed the hood of his sweatshirt, and "stared" at Mr. Stewart before walking down Venango and turning back onto 13th Street. *Id.* at 3–4. People were around James Moore "picking up items that [Mr. Stewart] couldn't see while others were yelling." *Id.* at 4. He told "Straw" what had just happened, noted that others were "whispering to her," and explained that "Straw" later stated that "Rasul did it" and "mentioned that Rasul was Sharron's son who just got out." *Id.*

Mr. Stewart also identified Rasul Moore in a photo lineup given to him as part of that same interview. *Id.* at 5, Commw. Ex. 7. He explained that Rasul Moore was the man he had seen walking on Camac Street with James Moore when James Moore was shot and that he "saw [Rasul Moore] making a gesture like he was placing a gun into the front of his pants after the shooting." Commw. Ex 6, at 5.

Andre Stewart proved to be the lynchpin of the Commonwealth's case against Rasul Moore. Still, Mr. Stewart's trial testimony suffered from numerous flaws.

To begin, Mr. Stewart could not fully explain why he was present in the neighborhood that day. He explained that he was in the neighborhood on the day of the shooting for only a few hours because he had been "carjacked," and he was trying to locate his car. Mar. 22, 2005 Trial Tr., at 98:8–10. He believed that "[a]n individual involved hung in that area" so he had "targeted" that

area in an attempt to locate his vehicle. *Id.* at 98:13–17. He also claimed, however, to be in the area because he "had a couple friends in the area" but was allegedly *not* going there to hang out with them. *Id.* at 155:5–12. Mr. Stewart apparently had been familiar with the neighborhood for a "couple of months" and knew "several" people there. *Id.* at 98:24, 99:20.

Likewise, Mr. Stewart could not fully explain how he knew James Moore nor for how long he had known him. In his statement to the police immediately after the shooting, he explained that he had only just met James Moore "about an hour before the shooting." Commw. Ex. 6, at 1. But at trial he testified that while he did not "know him personally," he "indirectly" knew James Moore because he had seen him "passing through" the area on "a few occasions" "at night [and] in the morning." Mar. 22, 2005 Trial Tr., at 99:23, 100:1–5.

Mr. Stewart's version of events that day also suffered from factual inconsistencies. In his statement to the police, Mr. Stewart recalled Rasul Moore turning the corner after the alleged shooting and "making a gesture like he was placing a gun into the front of his pants after the shooting." Commw. Ex. 6, at 5. At trial, however, Mr. Stewart testified that Rasul Moore gestured like he was putting something in the *back* of his pants. Mar. 22, 2005 Trial Tr., at 146:15–18. In addition, Mr. Stewart explained in his statement that he saw people standing around James Moore's body picking up "items that [he] couldn't see, but at trial, years later, he testified that people were picking up the bullet casings. Commw. Ex. 6, at 4; Mar. 22, 2005 Trial Tr., at 119:23–25. Mr. Stewart could not recall when he first remembered this detail that the people were picking up bullet casings. Mar. 22, 2005 Trial Tr., at 150:16–19.

In addition, Mr. Stewart testified explicitly that his statement to the police was incorrect in a few respects. First, in his statement to the police he explained that the man James Moore was speaking to just before the shooting was a "regular" in the neighborhood but at trial he admitted

that he did not know that to be true. Commw. Ex. 6, at 5; Mar. 22, 2005 Trial Tr., at 152:22–25.

Second, in his statement, he detailed only that Rasul Moore told James Moore "something like 'come here'" before walking around the corner and allegedly shooting James Moore, but at trial he testified that Rasul Moore had grabbed James Moore's sweatshirt and partially forced him around the corner. Commw. Ex. 6, at 3; Mar. 22, 2005 Trial Tr., at 112:4–11, 156:24–157:6, 158:2–3. Mr. Stewart testified that, when reviewing his statement to the police, he did not tell the police that certain information was incorrect, nor did he seek to correct that information. Mar 22, 2005 Trial Tr., at 159:1–13.

The jury also had reason to doubt Mr. Stewart's testimony based on his prior convictions. The jury heard that Mr. Stewart had been arrested more than once for theft. *Id.* at 124:5–10, 139:11–14. The jury also heard that he had been on probation in 1996 for cashing a bad check.[12] *Id.* at 139:1–5. As the trier of fact, the jury could have reasonably seen these prior convictions and decided to discount Mr. Stewart's already inconsistent testimony. 225 Pa. Code. § 609(b)(1); *Wright v. West*, 505 U.S. 277, 296 (1992).

Even the prosecution's own conduct cast doubt on Mr. Stewart's credibility as a witness. Officer Daukus noted that when he first encountered Mr. Stewart "[h]e looked like a street person" and noted that Mr. Stewart was "ragged [and] dirty" and "had a couple of bags with clothes in it." *Id.* at 90:23–91:2. Even though Mr. Stewart was apparently "coherent" *id.* at 91:4, and identified Rasul Moore as the shooter in a photo array, police did not seek a warrant to search Rasul Moore's home or even bring him in for questioning until his arrest 15 months later—suggesting that they

---

[12] The trial judge entirely refused to permit any questions to Mr. Stewart about any crimes older than 10 years. Mar. 22, 2005 Trial Tr., at 133:6–8. Under the Pennsylvania Rule of Evidence 609, however, that a witness's conviction is older than 10 years does not automatically make it inadmissible. Instead, the trial court must weigh the evidentiary value of that conviction and determine that "its probative value substantially outweighs its prejudicial effect." 225 Pa. Code. § 609(b)(1). This is identical to Federal Rule of Evidence 609. Fed. R. Evid. 609(b)(1). Based on the trial record, it appears that the trial judge categorically excluded other of Mr. Stewart's convictions that were older than 10 years without weighing their probative or prejudicial value.

*themselves* did not consider Mr. Stewart's testimony credible enough to act upon. This was confirmed by Detective Harris who testified that he was brought onto the case later because "it was an unsolved homicide." Mar. 23, 2005 Trial Tr., at 47:18–19.

    *ii.*   *Mr. Atkins*

    Mr. Atkins gave his statement to police on December 18, 2003, approximately 14 months after the shooting. In that statement, Mr. Atkins explained that he had known James Moore "from around the neighborhood" and that he had last seen him "[a] few minutes before he got shot." Commw. Ex. 1, at 1. Mr. Atkins had seen James Moore "walk[ ] around the corner onto Camac St. from Venango St. with Rasul." *Id.* Mr. Atkins then went into a nearby house to go to the bathroom and heard gunshots. *Id.* at 2. He also noted that James Moore's body lay "in the street right across from where him and Rasul was standing when [he] last saw them." *Id.*

    At trial, Mr. Atkins contradicted much of this statement. For example, he said that he never saw Rasul Moore with James Moore on the day of the shooting. Mar. 22, 2005 Trial Tr., at 40:21–41:1. But, in his statement to the police, he stated that he had seen Rasul Moore and James Moore standing together near a local store. Commw. Ex. 1, at 2. Mr. Atkins then changed his testimony and stated that he had seen them together on the street just before James Moore was shot. Mar. 22, 2005 Trial Tr., at 47:9–48:3.

    Mr. Atkins also functionally disavowed most of his statement. The police were apparently "circling the block" and sought out Mr. Atkins. *Id.* at 42:21–22, 43:16–18. He testified that he only "vaguely" remembered speaking with police at the time of his statement because he was "smoking weed." *Id.* at 42:20–22, 43:9–11. He then said that he only spoke to police because "they threatened [him]" with a probation violation and said the officer "just kept sitting there, trying to make me say something I did not see." *Id.* at 44:2–4, 44:16–18, 53:22–54:15. Mr. Atkins then said that he had been drinking in addition to smoking marijuana at the time of the shooting, *id.* at 52:1–3, and

that he was "not really sure" that he saw Rasul Moore and James Moore prior to the shooting because he "was getting high that whole morning." *Id.* at 53:7–9.

Prior inconsistent statements and drug use potentially affecting a witness's perception are both fair grounds for impeachment. 225 Pa. Code §§ 607, 613. Of course, a jury is free to believe one part of a witness's testimony and disbelieve another part. *United States v. Boone*, 279 F.3d 163, 189 (3d Cir. 2002). The trial judge explained this to the jurors. Mar. 23, 2005 Trial Tr., at 142:9–13. Still, evidence that a witness was under the influence of drugs undermines a witness's credibility because it calls into question a witness's ability to perceive events correctly, remember those events, and later accurately narrate those events. *Wilson v. Beard*, 589 F.3d 651, 666 (3d Cir. 2009).

Here, the Commonwealth was apparently concerned that Mr. Atkins's credibility and testimony had been undermined. Later, the Commonwealth had Detective Harris, who had conducted the interview of Mr. Atkins, read Mr. Atkins's statement to the police into evidence. Mar. 23, 2005 Trial Tr., at 37:8–13, 38:12–40:10. This evidence apparently came in for the jury to consider substantively, rather than solely as impeachment evidence.[13]

### iii.    Ms. Patterson

Ms. Patterson likewise gave a statement to the police 14 months after the shooting, on December 16, 2003. And, like Mr. Atkins, she contradicted her earlier statements and basically recanted at trial.

First, in her statement she explained that she had known James Moore "for about 8 or 9 years" and had known Rasul Moore "since he was a little kid." Commw. Ex. 2, at 1–2. At trial,

---

[13] The trial record does not contain the precise reason why the Court permitted the statements to be read into evidence. *See* Mar. 23, 2005 Trial Tr. at 8:5–11:10. It may well be that they came in under the Pennsylvania exceptions to hearsay evidence, which are broader than the federal exclusions. *Compare* 225 Pa. Code § 803.1, *with* Fed. R. Evid. 801.

however, Ms. Patterson testified that she did not recognize Rasul Moore in the courtroom and explained that the events "happened a long time ago." Mar. 22, 2005 Trial Tr., at 59:3–8. She then testified that she had only known James Moore for "[p]robably like a couple of months or something from just hanging around," Mar. 22, 2005 Trial Tr., at 58:8–9. Finally, and only after being confronted with her prior statement to the police, she admitted that she had known Rasul Moore since he was a child. *Id.* at 69:15–20.

Second, in her statement she explained that she had walked away from the area and "had only been gone for like about 15 or 20 minutes and when [she] got back onto Venango St. they was hollering Rasul just killed Bey." Commw. Ex. 2, at 1. At that point, Ms. Patterson noted that she "saw Rasul come running around the corner from off of Camac St. with a gun in his hand." *Id.* At trial, however, Ms. Patterson testified that she was not present at the scene on October 21, 2002. *Id.* at 58:14–16.

And, like Mr. Atkins, Ms. Patterson's testimony gave the jury plenty of reason to doubt her. Ms. Patterson explained that she did not remember much about speaking to the police because she had been in in prison at the time. Mar. 22, 2005 Trial Tr., at 60:9–15; Mar. 23, 2005 Trial Tr., at 36:23–25. On direct, Ms. Patterson also said that she did not remember giving her statement to the police because she "was strung out on drugs" and "might have said anything" at the time. Mar. 22, 2005 Trial Tr., at 61:13–15. She then explained that she was only testifying at trial because the police told her she "was going to be arrested" if she refused. *Id.* at 71:23–25. But on cross examination, she contradicted herself and said that she was *not* taking drugs when she was in prison at the time that she gave her statement. *Id.* at 76:9–11.

As with Mr. Atkins, the Commonwealth was apparently concerned that Ms. Patterson's credibility and testimony had been undermined, so the Commonwealth had Detective Harris read

most of Ms. Patterson's December 2004 statement into evidence for the jury to consider substantively. Mar. 23, 2005 Trial Tr., at 43:16–47:8.

The Commonwealth's case depended on the jury's acceptance of the testimony from these three witnesses. But the testimony of all three suffered from flaws ranging from inconsistencies to wholesale recantations. There was no actual witness to the shooting, no corroborating physical evidence, and no apparent motive. "In simple terms, it is the type of case where reasonable doubt plays a fundamental role." *Brooks*, 2017 WL 3475475, at *8; *accord Corbin*, 2021 WL 2550653, at *6.

### 2. The Length of the Jury's Deliberation, Numerous Questions, and Deadlock Further Demonstrate Prejudice

The nature of the jury deliberations in this case confirm that Mr. Moore suffered prejudice as a result of his trial counsel's failure to object to the reasonable doubt instruction. "[T]he length of jury deliberations may be one consideration in assessing the strength of the prosecution's case." *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 805 (3d Cir. 2020). A "considerable" deliberation period, particularly one longer than the trial itself is "a strong indication [that the] case was a close call for the jury," especially when "coupled with the jury's request for 'guidance' as to the charges." *Id.* That is precisely what happened here—the jury deliberated for longer than the length of trial, had numerous questions about the evidence, deadlocked, and requested further guidance as to the charges.

The jury began deliberations on the afternoon of March 23, 2005, and continued deliberations on March 24, 2005, and March 28, 2005, before coming to a verdict on the afternoon of March 28, 2005. In total, the jury deliberated for more than two days—after a trial that lasted less than two days. *See id.* at 799, 805 (jury deliberated for six days after a five-day trial).

During their deliberations, the jury had numerous questions for the court. Minutes after beginning deliberations on March 23, the jurors requested all photographs of the crime scene. Mar. 23, 2005 Trial Tr., at 162:18–163:1. The next morning, the jurors requested a copy of Mr. Stewart's statement to the police. Mar. 24, 2005 Trial Tr., at 3:6–9. Both counsel agreed that a copy of Mr. Stewart's statement should *not* be given to the jury and the court agreed; the jury was instructed to rely on their own recollection. *Id.* at 3:10–4:25. Thirty minutes later, the jury asked if Mr. Stewart witnessed Mr. Moore put away a gun or object as he crossed in front of Mr. Stewart. *Id.* at 5:5–8. After discussion with counsel, the court told the jury no. *Id.* at 15:13–25.

Two hours after that, the jury informed the court that they were deadlocked: "[W]e the jury based on the information cannot come to a decision with -- we can't come to a decision on the charges based on the information and testimony that we have." *Id.* at 17:3–7. The trial judge said that she would not accept a hung jury at that point and explained that she would attempt to answer any of the jury's questions. *Id.* at 17:8–20.

The next Monday, March 28, 2005, the jury continued deliberating. Around 11 a.m., the jury requested clarification from the court as to the difference between first-degree and third-degree murder. Mar. 28, 2005 Trial Tr., at 3:12–14. The court read the murder instruction to the jurors again. *Id.* at 3:15–7:16.

Three hours later, at 2 p.m., the jury returned with still more questions. Specifically, the jury wanted to know Mr. Atkin's location at the time of the shooting, what Mr. Atkins saw before he entered the house, and Ms. Patterson's location when she saw Rasul Moore with a gun. The jury also wanted to know the date of Rasul Moore's arrest and *why* it took 14 months from the shooting to take statements from Mr. Atkins and Ms. Patterson. *Id.* at 8:3–18:10. After conferring

with the prosecutor and Mr. Moore's counsel, the court answered most of the questions but did not address the 14-month period prior to the statements by Mr. Atkins and Ms. Patterson. *See id.*

About an hour later, the jury returned with a verdict, finding Rasul Moore not guilty of first-degree murder, guilty of third-degree murder, and guilty of possession of an instrument of crime. *Id.* at 20:1–7.

Considering the relative weakness of the evidence introduced at trial and the sequence of the jury's deliberations, this Court concludes that Mr. Moore suffered prejudice as a result of his counsel's failure to object to the reasonable doubt jury instruction. Plainly the jury was indecisive about convicting Mr. Moore at all. Therefore, there is a "reasonable probability" that, but for the unconstitutional reasonable doubt instruction from which the jury might have applied a lower standard of doubt than required to convict, at least one juror would have had reasonable doubt and a reasonable jury would not have found Mr. Moore guilty. *Strickland*, 466 U.S. at 694; *Buck*, 137 S. Ct. at 776. Indeed, given the nature of the jury deliberations, Mr. Moore has shown that this probability is more than just conceivable—it is substantial—and it is certainly sufficient to undermine confidence in the outcome. *Harrington*, 562 U.S. at 112.

Whether or not this Court would, viewing all the evidence, come to a different conclusion on the same evidence is immaterial. This Court is not a "thirteenth juror." Mr. Moore is guaranteed effective counsel by the Sixth Amendment to the United States Constitution to ensure that his trial was fair and produced a result that is reliable. *Strickland*, 466 U.S. at 687. Without reliable results, our system of justice risks becoming an instrument of injustice.

## CONCLUSION

"The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic

41

and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" *In re Winship*, 397 U.S. 358, 363 (1970) (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)). Here, the faulty reasonable doubt instruction coupled with the weak evidence presents the likely possibility that Mr. Moore was convicted by a jury using a burden of proof standard allowing much more doubt than is permitted by the Due Process Clause. This is a defect that our Constitution and our system of justice cannot tolerate.

For the foregoing reasons the Court grants Mr. Moore's petition. The Commonwealth must retry him within 180 days or release him. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE